UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JAMES SUSIENKA and SHARON )   CIVIL ACTION NO. 99-40059
SUSIENKA, )
 )
        Plaintiffs, )
 )
v. )
 )
UNITED PARCEL SERVICE, INC., )
ROBERT FERRY and TIMOTHY )
McKENDRY, )
 )
        Defendants. )

MEMORANDUM IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

I.   **Introduction**

This action arises out of plaintiff James Susienka's ("Susienka") former employment

with defendant United Parcel Service, Inc. ("UPS").   In March, 1996, UPS conducted an

investigation into allegations of widespread wrongdoing at its facilities in the Worcester,

Massachusetts, area, including allegations of expense account fraud and manipulation of

package delivery data and time cards.   As a result of this investigation, UPS discharged

Susienka and seven other employees and disciplined others.   Susienka filed this claim in

February, 1999, alleging claims for false imprisonment (Counts I, III, and V), breach of the

implied covenant of good faith and fair dealing (Count XIX), wrongful discharge in violation

of public policy (Count XXI), intentional infliction of emotional distress (Counts XXIII and

XXV), and violation of the Massachusetts Civil Rights Act ("MCRA") (Count XXVIII).   Also

named as defendants are Timothy McKendry and Robert Ferry, two UPS employees who

participated in the investigation.   Susienka's wife, Sharon Susienka, has asserted claims for

loss of consortium (Counts XI, XII and XV). Pursuant to Fed. R. Civ. P. 56, defendants move to dismiss all counts of the Susienkas' Complaint.

## II.    Statement of Material Facts

1.    From 1992 until his last day of active employment at UPS in March, 1996, Susienka was the Center Manager for UPS's Worcester West facility. (Deposition of James Susienka, p. 10).[1]

2.    In March, 1996, UPS received information from two UPS employees that there were widespread problems with expense account fraud and manipulation of package delivery data and time cards. (Stokes dep., p. 24; McKendry dep., p. 48-49, 51; McKendry dep. ex. 2).[2]    As a result of this information, the District Human Resource Manager for the East New England district, Michael Stokes, the Loss Prevention Manager for East New England, Tim McKendry, and the East New England District Manager, John Jones, decided to investigate the alleged wrongdoing.    (McKendry dep., p. 55-57).    Loss Prevention reviewed operations reports, timecards, and expense reports for the Worcester area centers.    (McKendry dep., p. 60-61).    Approximately 30-35 people were interviewed.    (Stokes dep. p. 100-01).    The bulk of the interviews occurred on March 21, 1996, at UPS's Westborough, Massachusetts, facility.

3.    On March 21, 1996, Susienka received a call at approximately 8:15 or 8:30 a.m. directing him to report to the Westborough facility with his supervisors.    (Susienka dep.,

---

[1] Excerpts from the transcript of the deposition of James Susienka are attached as Exhibit A to the Appendix.

[2] Excerpts from the transcript of the deposition of Michael Stokes are attached as Exhibit B to the Appendix; excerpts from the transcript of the deposition of Timothy McKendry are attached as Exhibit C to the Appendix; and Exhibit 2 from the deposition of Timothy McKendry is attached as Exhibit D to the Appendix.

p. 98-99).[3]   Susienka arrived at Westborough at approximately 9:00 a.m.   (Susienka dep.,
p. 104).   Susienka went to a break room where there were other managers and supervisors
from the Worcester area centers.   (Susienka dep., p. 106-07).   Someone told the group that
there was an investigation going on, not to talk to each other, not to answer their beepers or
cell phones, and to remain in the room.   (Susienka dep., p. 108-09).   People were, however,
talking among themselves.   (Susienka dep., p. 107-08).   Jim Pacetti, a Loss Prevention
supervisor, stood at the door to the break room.   (Susienka dep., p. 115).   Approximately 15-
25 people were in the break room.   (Susienka dep. p. 113).

4.     At approximately 12:00 p.m., Susienka and the other remaining employees went
downstairs to the cafeteria for lunch.   (Susienka dep., p. 110-11, 115).   Before that time, the
employees allegedly were not permitted to go to the cafeteria.   *Id.*   During lunch, Susienka
used the rest room.   (Susienka dep., p. 114).

5.     After lunch, the employees returned to the break room.   (Susienka dep., p.
117).   People left the room to be interviewed.   (Susienka dep., p. 121).   While in the break
room, Susienka was nervous because he did not know what the purpose of the investigation
was.   (Susienka dep., p. 137).   Susienka was called for his interview at approximately 4:00
p.m.   (Susienka dep., p. 124).   Susienka remained in the break room that day because he
thought that if he left he would have lost his job at UPS.   (Susienka dep., p. 123-24).

6.     Susienka's interview occurred in a room down the hall from the break room.
(Susienka dep., p. 124).   The room was approximately 10' x 10' and had a desk and three

---

[3] What actually occurred on March 21, 1996, is disputed in many respects among the parties.   For the
purposes of this motion only, UPS sets forth Susienka's version of what occurred, as it must for purposes of
summary judgment.   If for any reason this motion is denied, UPS reserves the right to contest Susienka's
allegations.

chairs in it. (Susienka dep., p. 124-25).[4] Ken DePeau, a Quality Manager, and Bob Ferry, a Loss Prevention employee, were already in the room when Susienka arrived. (DePeau dep., p. 19; Feery dep., p. 6-7; Susienka dep., p. 125). Before the interview, Susienka had not known Ferry. (Susienka dep., p. 125). Ferry asked questions during the interview and DePeau took notes. (Feery dep., p. 78-79). The interview lasted approximately one hour. (Susienka dep., p. 130). Ferry allegedly told Susienka that there was an investigation going on, he should read and sign a paper, and if he did not sign the paper he would be discharged. (Susienka dep., p. 131). Ferry allegedly told Susienka that if he discussed the investigation with anyone he would be discharged. (Susienka dep., p. 132). Ferry allegedly asked Susienka if he had ever done anything unethical at UPS or instructed anyone to do something unethical at UPS. (Susienka dep., p. 131). Ferry's tone of voice was allegedly harsh. (Susienka dep., p. 131).

7.      Susienka allegedly was sweating and shaking; but his voice remained calm during the interview. (Susienka dep., p. 136-37, 157). Susienka's interview with Ferry was allegedly marked by profanity, loud voices, statements that Susienka would lose his job if he did not cooperate and questions about why Susienka was protecting Larry Jette. (Susienka dep., p. 137-42). Ferry also allegedly told Susienka that he had documentation that Susienka had picked up a prostitute.[5]  (Susienka dep., p. 151).

---

[4] Excerpts from the transcript of the deposition of Kenneth DePeau are attached as Exhibit E to the Appendix and excerpts from the transcript of the deposition of Robert Ferry are attached as Exhibit F to the Appendix.

[5] On one occasion, UPS employees, including Susienka, spent the morning painting a homeless shelter as part of a United Way event. Susienka and others stopped painting at 1 or 2 p.m. and went to a bar for at least several hours. Susienka allegedly saw two UPS managers leave the bar with a prostitute; the managers later bragged to Susienka about taking her to a motel. (Susienka dep., p. 151-53).

8.     Ferry remained seated during the entire interview.  (Susienka dep., p. 155).
Ferry allegedly slammed his hand on the desk a couple of times during the interview.
(Susienka dep., p. 155).  After about one hour, Ferry allegedly stood up, opened the door to
the room, swore at Susienka, left the room and slammed the door.  (Susienka dep., p. 147).

9.     Ferry allegedly returned to the room with paper and told Susienka to write down
everything that had been discussed.  (Susienka dep., p. 148).  Ferry then allegedly again swore
at Susienka and left the room, slamming the door.  (Susienka dep., p. 150).  Susienka wrote
the following statement:  "I feel I have answered all questions truthfully.  And if people have
made allegations that I have done something wrong I feel I have not."  (Susienka dep., p. 157-
158; Susienka dep. ex. 13).[6]  DePeau left the room, and Susienka remained there for a few
minutes by himself.  (Susienka dep., p. 158).

10.    Tim McKendry then entered the room and sat down approximately one foot
away from Susienka.  (Susienka dep., p. 158-59).  Susienka immediately said that he had told
Ferry everything he knew.  (Susienka dep., p. 158).  McKendry allegedly screamed at Ferry.
(Susienka dep., p. 159).  Susienka's hands were allegedly shaking, but they may have been
under the table.  (Susienka dep., p. 160).  Susienka's interview with McKendry was also
allegedly marked by profanity, loud voices, statements that Susienka would lose his job it he
did not tell the truth and answer the questions asked, and questions about why Susienka was
protecting Larry Jette.  (Susienka dep., p. 159-64).

11.    McKendry also showed Susienka some operations reports and asked him
questions about them.   Susienka was unable to answer McKendry's questions about the

---

[6] Exhibit 13 from the deposition of James Susienka is attached as Exhibit G to the Appendix.

operations reports because he was allegedly too nervous. (Susienka dep., p. 162-63). McKendry told Susienka that he had instructed his supervisors to change numbers in the computer. (Susienka dep., p. 174). Susienka's interview with McKendry lasted approximately 15 or 20 minutes. (Susienka dep., p. 161).

12.    McKendry and Ferry allegedly tried to make Susienka provide false statements about co-workers to the effect that Larry Jette had made racist comments during a conference call, that Susienka was the fall guy for Larry Jette, and that others had forced Susienka to pick up restaurant tabs. (Susienka dep., p. 173-75, 177-78).

13.    During the interview with McKendry, Susienka started to get lightheaded and his chest began to hurt. (Susienka dep., p. 163, 166). Susienka grabbed his chest and told McKendry to stop, which McKendry did. (Susienka dep., p. 167). Susienka fell to the floor. (Susienka dep., p. 167). McKendry left the room and asked someone to call an ambulance. (McKendry dep., p. 208). Stokes came into the room and asked Susienka if he wanted some water. (Stokes dep., p. 199). Stokes got Susienka a glass of water and wet a paper towel to wipe Susienka's face. (Stokes dep., p. 199-201). An ambulance arrived at Westborough at 5:42 p.m. and transported Susienka to Memorial Hospital, where he was diagnosed with unstable angina. (Westboro Police Department dispatch log; Hospital Discharge Summary).[7]

14.    The only reason Susienka remained at Westborough on March 21, 1996, was because he thought if he left he would lose his job at UPS. (Susienka depo., p. 172-73). Susienka never returned to work at UPS after March 21. In a memo dated March 22, 1996,

---

[7] A certified copy of the Westboro Police Department dispatch log is attached as Exhibit H and the Discharge Summary for James Susienka from the University of Massachusetts Memorial Health Care is attached as Exhibit I.

Stokes and McKendry recommended that Susienka be discharged.  (McKendry dep. ex. 6;[8] McKendry dep., p. 117-18.)   In August, 1996, Susienka was discharged due to the manipulation of production numbers at his center and his expense account improprieties. (Stokes dep., p. 241-42, 270-71).

## III.  Argument

### A.   THE SUMMARY JUDGMENT STANDARD.

To survive a motion for summary judgment, the opposing party must demonstrate that there is a genuine issue of material fact requiring a trial.  Fed. R. Civ. P. 56(e); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).   "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).   Summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to summary judgment as a matter of law." *Celotex*, 477 U.S. at 322; *see LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 841 (1st Cir. 1993), *cert. denied*, 511 U.S. 1018 (1994).   To withstand a motion for summary judgment, the nonmoving party "may not rest upon mere allegation or denials of his pleading." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *LeBlanc*, 6 F.3d at 841.   Rather, the nonmoving party must establish a triable issue by presenting

---

[8] Exhibit 6 from the deposition of Timothy McKendry is attached as Exhibit J.

"enough competent evidence to enable a finding favorable to the nonmoving party." *Goldman v. First Nat'l Bank of Boston*, 985 F.2d 1113, 1116 (1st Cir. 1993) (*citing Anderson*, 477 U.S. at 249).

B. SUSIENKA'S FALSE IMPRISONMENT CLAIMS FAIL BECAUSE THE ONLY REASON HE REMAINED AT WESTBOROUGH ON MARCH 21, 1996, WAS FROM FEAR OF LOSING HIS JOB IF HE LEFT.

Susienka has asserted claims for false imprisonment against UPS, Ferry, and McKendry (Counts I, III, and V) based on his alleged confinement on March 21, 1996, at the Westborough facility. (Complaint, ¶¶ 85, 97, 109). Susienka testified, however, that the only reason he remained at Westborough on March 21, 1996, was that he thought he would lose his job at UPS if he left.[9] (Susienka dep., p. 123-24, 172-73.) Susienka also does not allege that he was anything other than an at-will employee of UPS. The Massachusetts Supreme Judicial Court has clearly stated that the threat of discharge from at-will employment cannot form the basis for a false imprisonment claim against one's employer. *Foley v. Polaroid Corp.*, 400 Mass. 82, 91-92 (1987) ("But an employee at will who relinquishes his right to move about in return for continued employment, to which he is not entitled, is not imprisoned. He has a free

---

[9] Susienka cannot contradict this deposition testimony by submitting an affidavit because a party cannot create a disputed issue of fact sufficient to defeat summary judgment by submitting an affidavit that contradicts his own statements previously made under oath at deposition. *Williams v. Raytheon Co.*, 45 F. Supp. 2d 124, 129 (D. Mass. 1999), *aff'd*, 220 F. 3d 16 (1st Cir. 2000). Susienka testified at deposition as follows:

Q: At any point from the time that you arrived that morning in Westborough until you had the situation where you said you grabbed your chest, did you ask to leave?
A: No.
Q: And the reason that you stayed there that day, you said, was because you thought that you would lose your job if you left; is that correct?
A: Yes.
Q: Was there any other reason?
A: No.

(Susienka dep. p. 172-73.)

choice."). Susienka's false imprisonment claims fail because the only reason he remained at Westborough was from fear of losing his at-will employment at UPS. *See id.*

C.   SUSIENKA'S MCRA CLAIM FAILS BECAUSE HE CANNOT IDENTIFY THE EXISTENCE OF A SECURED RIGHT WITH WHICH UPS ALLEGEDLY INTERFERED.

The Massachusetts Civil Rights Act, Mass. Gen. Laws ch. 12, § 11I, prohibits persons from interfering, or attempting to interfere, by threats, intimidation, or coercion with the exercise or enjoyment by any other person of rights secured by the constitution or laws of the United States or of the commonwealth. Continued at-will employment is not a secured right for purposes of a MCRA claim. *Flesner v. Technical Communications Corp.*, 410 Mass. 805, 818-819 (1991); *see also French v. UPS*, 2 F. Supp. 2d 128, 133 (D. Mass. 1998) (threat of adverse employment action to at-will employment does not constitute MCRA violation); *Webster v. Motorola, Inc.*, 418 Mass. 425, 430 (1994) (same). Susienka cannot identify the loss of a secured right with which UPS allegedly interfered. The alleged threatened loss of his at-will employment does not qualify, *see id.*, and as set forth above in Part B, Susienka does not have a valid false imprisonment claim. Because Susienka cannot identify a secured right with which UPS allegedly interfered, his MCRA claim should be dismissed.

D.   SUSIENKA'S CLAIMS FOR BREACH OF THE IMPLIED COVENANT AND FOR WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY SHOULD BE DISMISSED BECAUSE SUSIENKA FAILS TO IDENTIFY A WELL-ESTABLISHED PUBLIC POLICY IMPLICATED IN HIS DISCHARGE.

Susienka's claims for breach of the implied covenant of good faith and fair dealing and for wrongful termination in violation of public policy are premised on the same allegation—that UPS allegedly discharged him for refusing to provide false information about his manager Larry Jette. (*See* Complaint, ¶¶ 162, 169.) Susienka claims that during the March 21, 1996,

interviews, McKendry and/or Ferry tried to force him to say that: (1) Larry Jette had made racist comments during a conference call for which Susienka was present; (2) that Susienka was the "fall guy" for Jette; and (3) that Susienka was forced to pick up bar or restaurant tabs. (Susienka dep., p. 173-75, 177-78).

At the outset, UPS moved to dismiss Susienka's claim for wrongful discharge in violation of public policy on the ground that Susienka had failed to identify a clearly established public policy that was implicated in his discharge. In its Order on that motion, this Court acknowledged that Susienka had alleged that he was discharged for refusing to implicate co-workers in signed statements charging theft, misappropriation of company funds, sex discrimination and other offenses.[10]  (Memorandum and Order, p. 5).  This Court then reviewed cases decided by the Massachusetts Supreme Judicial Court that stated that it would be a violation of public policy to discharge an employee for refusing to commit perjury. The Court extended those statements to hold that Susienka had stated a claim for wrongful discharge in violation of public policy by alleging that he was discharged for refusing to provide false statements internally at UPS about his co-workers. (*Id.* at 4-5).  In light of the record developed since that ruling and what UPS contends was an incorrect expansion of Massachusetts law, UPS respectfully requests that this Court reconsider its ruling.

Massachusetts courts have construed the public policy exception narrowly, acknowledging that to do otherwise would convert the general rule of at-will employment into a rule that requires just cause to discharge an employee. *King v. Driscoll,* 418 Mass. 576, 582 (1994); *Perkins v. Com.,* 52 Mass. App. Ct. 175, 180 (2001); *Mitchell v. TAC Tech. Serv.,*

---

[10]  As set forth above, Susienka came up with substantially fewer alleged false statements at his deposition to substantiate his claim. (*See supra* p. 6; Susienka dep., p. 174-75, 177-78).

*Inc.*, 50 Mass. App. Ct. 90, 93 (2000). Massachusetts courts have recognized that an employee's discharge is contrary to public policy if it is the result of: (1) the employee's assertion of a legally guaranteed right; (2) the employee's doing what the law requires; (3) the employee's refusal to do what the law forbids; or (4) an employee's internal or external report of suspected criminal activity, but have refused to expand the doctrine beyond these narrowly enumerated exceptions. *See Upton v. JWP Businessland*, 425 Mass. 756, 757 (1997).

Since this Court's decision on UPS's Motion to Dismiss in March, 2000, Massachusetts courts have rejected multiple attempts to expand the doctrine. For example, in *Perkins*, plaintiff alleged that she was forced to participate in physical activities contrary to her doctor's advice; was deprived of sufficient water, rest, and medicine; and suffered other humiliation and hazing while undergoing training at the state police academy. *Id.* at 176. Plaintiff claimed that this treatment forced her to leave the academy in violation of public policy. In support of her claim that the conduct at issue implicated a clearly established public policy, plaintiff pointed to a state statute, Mass. Gen. Laws. ch. 269, § 17, that criminalizes hazing by student organizations. 52 Mass. App. at 179. The court noted that the statute applied to student organizations, not the education institutions themselves and found that plaintiff had not identified any "clearly established public policy" that the police academy had violated. *Id.* at 179-180. The court also stated: "the internal administration, policy, functioning and other matters of an organization cannot be the basis for a public policy exception to the general rule that at-will employees are terminable at any time with or without cause." *Id.* at 180.

Similarly, in *Mitchell*, an employee alleged that he was discharged for asking to see a Material Safety Data Sheet ("MSDS") for a hazardous material with which he was working and whose fumes were irritating him. 50 Mass. App. Ct. at 91, 95. To support his claim that

this discharge implicated a clearly established public policy, plaintiff cited a federal regulation that required employers to make MSDSs readily accessible to employees. *Id.* at 95. The court held that the regulation did not rise to the level of importance sufficient to modify the general rule of at-will employment and rejected plaintiff's wrongful discharge in violation of public policy claim. *Id.*

In a 1994 Superior Court case, decided by current Supreme Judicial Court Justice Cowin, which is remarkably similar to the case at bar, *Dietz v. Bytex Corp.*, 1994 WL 879690 (Cowin, J., Mass. Super. Ct. 1994), plaintiff claimed she was fired for refusing to lie to her co-workers. *Id.* at **4. The court referenced the limited range of allegations that can support a public policy claim and rejected plaintiff's claim. *Id.* ("Here, [plaintiff] claims that she was fired because she refused to lie to her co-workers. Even if this is true, it does not constitute an actionable claim for violation of public policy in Massachusetts."); *see also Beriont v. Reichlen*, 2000 WL 33170693 at **5 (Fahey, J., Mass. Super. Ct. 2000) (employee has legally guaranteed right to bring a lawsuit against his employer, but does not have legally guaranteed right to remain employed while lawsuit is pending; employee's claim for wrongful discharge in violation of public policy dismissed); *Delmonte v. Laidlaw Env. Serv.*, 46 F. Supp. 2d 89, 97-98 (D. Mass. 1999) (after employee announced engagement with woman who worked for another company, employer told employee that he must either resign, force his fiancee to resign, or face termination; employee's claim for wrongful discharge in violation of public policy claim dismissed because alleged "right to marry" does not rise to the level of a well-defined public policy limiting the general rule of at-will employment).

In its Order on UPS's Motion to Dismiss, this Court focused on the following *dicta* in *Upton v. JWP Businessland*, 425 Mass. 756 (1997):[11]  "[t]he plaintiff seeks to recover for a termination that was not, on its face, made because she did something that public policy strongly encourages (such as serving on a jury) or because she refused to engage in conduct that public policy strongly discourages (such as refusing to lie on behalf of her employer)." Order, p. 5; *Upton*, 425 Mass. at 758.  That particular sentence in *Upton* did not cite to any supporting case law, but did mirror the court's earlier statement in the opinion that "the public policy exception makes redress available to employees who are terminated for . . . doing what the law requires (e.g. serving on a jury), or for refusing to disobey the law (e.g. refusing to commit perjury)."  *Upton*, 425 Mass. 757, *citing Smith-Pfeffer v. Walter E. Fernald State School*, 404 Mass. at 149-150.  The *Upton dicta* concerning refusing to lie on behalf of one's employer is a simply a reference to, and must be read in context with, the court's earlier statement that it is a violation of public policy to discharge an employee for refusing to commit perjury.  Especially in light of the tight constraints the Massachusetts courts have placed on the public policy exception, that *dicta* does not support an expansion of the public policy exception to encompass any employee discharges that involve providing false statements.  *See also Dushkin v. Desai*, 18 F. Supp. 2d 117 (D. Mass. 1998) ("federal court, sitting in diversity jurisdiction, and only predicting the direction of state law should not blaze new and unprecedented jurisprudential trails to expand existing state doctrine") (internal citations omitted).

---

[11] *Upton* involved a single parent who claimed that she was discharged for refusing to work long hours that interfered with her need to care for her son, which is factually dissimilar to the case at bar.  425 Mass. at 756.  The quote itself expressly states that the plaintiff's factual circumstances for termination in *Upton* did not fall within the category of a discharge for failure to engage in conduct that public policy strongly discourages.

In apparent reference to *DeRose* and *Upton*, this Court's Order also stated that in "both situations, an employer terminated an employee who refused to lie and the Supreme Judicial Court recognized that such terminations violate public policy." (Order, p. 5). In *DeRose*, however, the Supreme Judicial Court recognized that an employee who claimed he was discharged for refusing to provide *false testimony* in a criminal trial stated a claim for wrongful discharge for violation of public policy. The case involved a refusal to commit perjury. 398 Mass. at 209-211. Similarly, as noted above, *Upton* did not involve an employee termination for refusing to lie. Rather, in *Upton*, the plaintiff, a single parent, claimed she was fired after refusing to work long hours that interfered with her need to take care of her son. 425 Mass. at 756. The Supreme Judicial Court acknowledged the Commonwealth's "broad policies of protecting the family unit and promoting the best interests of children," but rejected the proposition that these policies transformed the employee's discharge into a public policy violation. *Id.* at 759.

Similarly, here, Susienka's allegation that he was discharged for refusing to provide internal false statements about his manager, Larry Jette, does not implicate a clearly established public policy sufficient to sustain a wrongful discharge claim. *See id.* There is no statute that protects or mandates his alleged conduct. At best, it falls within the category of "socially desirable and appropriate conduct," which Massachusetts courts have repeatedly stated is insufficient to support a wrongful discharge in violation of public policy claim. *See, e.g., Wright v. Shriners' Hosp.*, 412 Mass. 469, 475-476 (1992) (nurse who alleges hospital discharged her for criticizing the quality of patient care to national survey team does not state public policy claim; nurse's criticisms, while perhaps appropriate and socially desirable, did not implicate any well-defined public policy); *Smith-Pfeffer v. Fernald State School*, 404 Mass.

145, 150-151 (1989) (plaintiff's discharge for criticizing quality of care rendered to mentally handicapped school residents does not violate public policy). Furthermore, the alleged conduct constitutes a matter of UPS's "internal administration, policy and functioning," which cannot form the basis for a public policy claim. *See Perkins*, 52 Mass. App. Ct. at 180.

E.   THE WORKERS' COMPENSATION ACT BARS SUSIENKA'S CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS.

The Massachusetts Workers' Compensation Act is the exclusive remedy for all injuries within its scope: "An employee shall be held to have waived his right of action at common law or under the law of any other jurisdiction in respect to an injury that is compensable under this chapter, to recover damages for personal injuries . . .." Mass. Gen. Laws ch. 152, § 24. "Personal injuries" include injuries resulting from intentional torts committed within the scope of the employment relationship. Mass. Gen. Laws ch. 152, § 1; *Doe v. Purity Supreme, Inc.*, 422 Mass. 563, 565 (1996); *Anzalone v. MBTA*, 403 Mass. 119, 124-25 (1988). The Workers' Compensation Act therefore bars claims against both the employer and co-employees based on intentional torts committed within the scope of employment and in furtherance of the employer's interest. *Anzalone*, 403 Mass. at 124-125 (employers); *Columbus v. Biggio*, 76 F. Supp. 2d 43, 57 (D. Mass. 1999) (co-employees).

In *Fusaro v. Blakely*, 40 Mass. App. Ct. 120 (1996), for example, plaintiff, a pharmacy technician at the University of Massachusetts Medical Center, was taken by members of the Medical Center's police force to its police station and interviewed about suspected drug-related activity at the Medical Center. The officers allegedly told the technician that he would be fired from his job if he did not confess to participating in drug dealing at the Medical Center, that they would arrange to have someone plant drugs in his car

and then have him arrested, and threatened to obtain an arrest warrant. One officer searched the technician's clothes, body, and car. *Id.* at 122-123. The court rejected the technician's claim for intentional infliction of emotional distress against the officers:

> the defendants were acting in the course of their employment and in furtherance of the Medical Center's interest when they undertook an investigation of possible drug dealing within the Medical Center and interviewed the plaintiff in connection with that investigation. However distorted the defendants' understanding of the proper performance of their duties may have been, we cannot say that they were acting outside the scope of their employment.

*Id.* at 123-124.

Susienka's intentional infliction claims against McKendry and Ferry fall squarely within the purview of *Fusaro. See id.* Susienka's claims are based entirely on the events of March 21, 1996, interview—before that time, Susienka had never met McKendry or Ferry. (Susienka dep., p. 125, McKendry dep., p. 46). McKendry and Ferry were acting well within the scope of their employment and in furtherance of UPS's interests when they investigated expense account fraud and time card and operations report manipulation at the Worcester area facilities. Consequently, the exclusivity provision of the Workers' Compensation Act bars Susienka's intentional infliction claims. *See Fusaro,* 40 Mass. App. Ct. at 123-124.

F.   SHARON SUSIENKA'S LOSS OF CONSORTIUM CLAIM MUST BE DISMISSED BECAUSE THERE IS NO VALID UNDERLYING TORT CLAIM TO SUSTAIN IT.

A loss of consortium claim may only be brought when the plaintiff's spouse has a valid tort claim. *Sheehy v. Town of Plymouth,* 948 F. Supp. 119, 126 (D. Mass. 1996); *Tauriac v. Polaroid Corp.,* 716 F. Supp. 672, 673 (D. Mass. 1989). A loss of consortium claim may not be predicated on a claim for injuries that are compensable under the Workers' Compensation Act. Mass. Gen. Laws ch. 152, § 24 ("the employee's spouse . . . shall also be held to have

waived any right created by statute, at common law, or under the law of any other jurisdiction against such employer, including, but not limited to claims for damages due to . . . loss of consortium . . . when such loss is a result of any injury to the employee that is compensable under this chapter"); *St. Arnaud v. Chapdelaine Truck Center, Inc.*, 836 F. Supp. 41 (D. Mass. 1993).  In addition, loss of consortium claims may not be predicated on a MCRA claim. *Columbus v. Biggio*, 76 F. Supp. 2d 43, 59 (D. Mass. 1999); *Staffier v. Sandoz Pharmaceuticals Corp.*, 888 F. Supp. 287, 293 (D. Mass. 1995).  As set forth above, Susienka does not have any valid tort claims against UPS, McKendry or Ferry.  Nor can she base a loss of consortium claim on Susienka's MCRA claim or his intentional infliction of emotional distress claim.  Accordingly, Sharon Susienka's claims for loss of consortium must be dismissed.

## IV.   Conclusion

For the reasons stated above, defendants UPS, McKendry and Ferry request that plaintiffs' claims be dismissed in their entirety.

UNITED PARCEL SERVICE, INC., TIMOTHY MCKENDRY and ROBERT FERRY,

By their attorneys,

## CERTIFICATE OF SERVICE

I hereby certify that on this day a true copy of the above document was served upon the attorney of record for each party by mail/by hand

Date: 11.30.01    Cvd Luft

Date: November 30, 2001

Christa von der Luft
Augustus F. Wagner, Jr. (BBO#511780)
Nelson G. Apjohn (BBO#020373)
Christa von der Luft (BBO#600362)
Nutter McClennen & Fish LLP
One International Place
Boston, MA 02110-2699
(617) 439-2000